# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| Thomas Charles Bear et al., | ) | |
| | ) | |
| Claimants, | ) | No. 13-51X |
| | ) | |
| v. | ) | Hon. Thomas C. Wheeler |
| | ) | |
| United States, | ) | |
| | ) | |
| Defendant. | ) | |

## CLAIMANTS' RESPONSE TO THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

August 15, 2016

Of counsel:

Stephen R. Ward, Esq.
John L. Williams, Esq.
Conner & Winters, LLP
4000 One Williams Center
Tulsa, Oklahoma  74172-0148
(918) 586-8978 (telephone)
(918) 586-8698 (facsimile)
sward@cwlaw.com
jwilliams@cwlaw.com

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, N.W.
Suite 1050
Washington, D.C. 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
nancie@marzulla.com
roger@marzulla.com

Counsel for Plaintiffs/Claimants

**Table of Contents**

Table of Authorities ............................................................................................................ ii

Table of Exhibits................................................................................................................ iv

Summary of Argument ........................................................................................................ 1

Standard of Review ............................................................................................................. 3

Argument ............................................................................................................................. 4

I.     The Government breached its duty of trust owed to the Quapaw by deeding 40 acres of land held in trust for the Quapaw Tribe to the Catholic Church, thereby extinguishing the trust title and reversionary interest the Tribe held in the land and minerals on the 40 acres....................................................................... 5

II.    The Government breached its duty owed to the Quapaw by failing to take reasonable steps to insure that town lots were productively leased and for failing to prevent trespassing................................................................................. 10

III.   The Government breached its duty owed to the Quapaw by failing to take reasonable steps to insure that agricultural land was productively leased ............. 16

       A.    The Quapaw do not claim that the Government must insure that all agricultural lands are leased ...................................................................... 19

       B.    The Quapaw do not claim that the Government has a duty to issue hunting leases ............................................................................................ 22

IV.   CERCLA does not provide an adequate legal remedy for the Quapaw's natural resources damages claim ..................................................................................... 24

Conclusion ......................................................................................................................... 29

**Table of Authorities**

**Cases**

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970)............................................................................................... 4, 13

*Bear Claw Tribe, Inc. v. United States*,
   36 Fed. Cl. 181 (1996) .............................................................................................. 24

*Bear v. United States*,
   112 Fed. Cl. 480 (2013) .................................................................................. 2, 25, 29

*Brown Park Estates–Fairfield Dev. Co. v. United States*,
   127 F.3d 1449 (Fed.Cir. 1997) ................................................................................. 28

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)................................................................................. 3
*Cia. Petrolera Caribe, Inc. v. Arco Caribbean,*
   *Inc.,* 754 F.2d 404 (1st Cir. 1985)......................................................... 1
*Cobell v. Norton,*
   240 F.3d 1081 (D.C. Cir. 2001) ............................................................ 18
*Confederated Tribes of Warm Springs Reservation of Or. v. United States,*
   248 F.3d 1365 (Fed. Cir. 2001) ................................................ 18, 19, 22
*Fort Berthold Reservation v. United States,*
   182 Ct. Cl. 543 (1968) ............................................................................ 2
*Fort Berthold Reservation,*
   182 Ct. Cl. .......................................................................................... 6, 10
*Goodeagle v. United States,*
   111 Fed. Cl. 716 (2013) ........................................................................ 28
*Heger v. United States,*
   103 Fed. Cl. 261 (2012) ............................................................. 3, 12, 13
*J.L. Simmons Co., Inc. v. United States,*
   60 Fed. Cl. 388 (2004) .......................................................................... 25
*Jaybird Mining Co. v. Weir,*
   271 U.S. 609 (1926) .............................................................................. 11
*Menominee Indian Tribe of Wis. v. United States,*
   39 Fed. Cl. 441 (1997) ............................................................................ 9
*Moose v. United States,*
   674 F.2d 1277 (9th Cir. 1982) .............................................................. 18
*New Mexico v. General Elec. Co.,*
   467 F.3d 1223 (10th Cir. 2006) ............................................................ 26
*Oenga v. United States,*
   91 Fed. Cl. 629 (2010) .......................................................................... 18
*P.R. Burke Corp. v. United States,*
   58 Fed. Cl. 549 (2003) ............................................................................ 3
*Quapaw Tribe of Oklahoma v. Blue Tee Corp.,*
   No. 03-CV-0846-CVE-PJC, 2008 WL 2704482 (N.D. Okla. July 7, 2008) .... 25, 26, 28
*Robinson v. Valdamudi,*
   No. 9:10-CV-01442 GTS, 2013 WL 877398 (N.D.N.Y. Jan. 31, 2013) ................. 4, 13
*SRI Int'l v. Matsushita Elec. Corp. of Am.,*
   775 F.2d 1107 (Fed. Cir. 1985) .............................................................. 3
*Sweats Fashions, Inc. v. Pannill Knitting Co.,*
   833 F.2d 1560 (Fed. Cir. 1987) .............................................................. 3
*United States v. Creek Nation,*
   295 U.S. 103 (1935) ................................................................................ 5
*United States v. Diebold, Inc.,*
   369 U.S. 654 (1962) ................................................................................ 3

*United States v. Sioux Nation of Indians*,
   448 U.S. 371 (1980) .................................................................................... 6
*Utah v. Kennecott Corp.*,
   801 F. Supp. 553 (D. Utah 1992) .............................................................. 25
*White Sands Ranchers of N.M. v. United States*,
   14 Cl. Ct. 559 (1988) ............................................................................ 4, 28

**Statutes**

25 U.S.C. § 162a(d)(8) ................................................................................... 12
25 U.S.C. § 2218 ............................................................................................ 12
25 U.S.C. § 3715 ............................................................................................ 16
25 U.S.C. § 397 .............................................................................................. 16
25 U.S.C. § 402 .............................................................................................. 16
25 U.S.C. § 402a (1926 Supp.) ...................................................................... 16

**Rules**

Fed. R. Civ. P. 1 ............................................................................................... 3
RCFC 56 ..................................................................................................... 1, 13

**Regulations**

25 C.F.R. § 171 (1938) ........................................................................ 16, 17, 18
25 C.F.R. § 162.108 ....................................................................................... 11

**Other Authorities**

House Resolution 668 .................................................................................... 29

**Table of Exhibits**

Ex. 1: 25 C.F.R. § 171 (1938)

Ex. 2: Excerpts from Deposition of J. Meyer (Feb. 17, 2016)

Ex. 3: Excerpts from Deposition of J. Duffield (July 15, 2016)

## CLAIMANTS' RESPONSE TO THE GOVERNMENT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

The Government seeks partial summary judgment on claims in each of the three coordinated cases. Claimants (collectively, the Quapaw) oppose these motions, responding as follows. The Government states that it may later support its motion with "arguments or evidence that may be presented in reply."[1] Should the Government offer new arguments or evidence, the Quapaw expressly reserve the right to request leave to respond to any new reasons or new evidence the Government may present in its Reply to support its motion.[2]

**Summary of Argument**

The Government's motions in the three cases—*Quapaw Tribe*, *Goodeagle*, and *Bear*—all share a common thread, they all re-hash arguments previously raised in the Government's motion to dismiss and prior summary judgment briefing. Many of the Government's arguments here have been previously rejected by this Court, which is reason enough for the Court to now deny the Government's motions. The Government's motions also repeatedly fail to meet its burden under Rule 56 that it demonstrate, with citation to the record, that a fact cannot genuinely be disputed.[3] The Government's motions also all fail on their merits.

The Government cannot deny that to prevail in this Congressional Reference case

---

[1] Def.'s Mot. at 1 (July 15, 2016) (*Bear* Doc. 142).

[2] *See, e.g.*, *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985) (when a moving party advances in a reply new reasons and evidence in support of its motion for summary judgment, the nonmoving party should be granted an opportunity to respond).

[3] RCFC 56(c)(1).

as the Court has held, the Quapaw "must show only two things: 'that the government committed a negligent or wrongful act' and that 'this act caused damage to the claimant.'"[4] The Government does not deny that it has committed negligent or wrongful acts—it only makes the conclusory assertion that "Plaintiffs, however, do not identify a duty that the United States owes,"[5] ignoring the detailed discussion of those duties in the Quapaw Analysis,[6] and the prior motions and the Court's rulings in this case. Specifically,

- The Government committed a wrongful or negligent act in 1908 when it conveyed forty acres of Quapaw land to the Catholic Church without just compensation, in violation of the Fifth Amendment;[7]

- The Government committed a wrongful or negligent act when it allowed mining companies, to whom it had leased restricted Quapaw lands, to cover those lands with mining waste—destroying their productive use for town lots and agricultural production;[8] and

- The Government committed a wrongful or negligent act when it contaminated the Quapaw's land, water and natural resources with heavy metals and hazardous waste, a wrong for which the Quapaw have no legal remedy.[9]

The Court should therefore deny the Government's motion for summary judgment

---

[4] *Bear v. United States*, 112 Fed. Cl. 480, 485 (2013) (internal quotation marks omitted) (*Bear* Doc. 16).
[5] Def.'s Mem. in Support of Mot. for Partial Summ. J. (Def.'s Mem.) at 4 (July 15, 2016) (*Bear* Doc. 142-1).
[6] Quapaw Analysis at 134–55 (2010) (*Quapaw Tribe* Doc. 14-1).
[7] *Fort Berthold Reservation v. United States*, 182 Ct. Cl. 543, 557 (1968) ("[I]t is the good faith effort on the part of Congress to give the Indians the full value of their land that identifies the exercise by Congress of its plenary authority to manage the property of its Indian wards for their benefit. Without that effort, Congress would be exercising its power of eminent domain by giving or selling Indian land to others, by dealing with it as its own, or by any other act constituting a taking."); Quapaw Analysis at 37.
[8] Quapaw Analysis at 6, 113–15.
[9] Quapaw Anlaysis at 113–15.

on these equitable Congressional Reference claims

**Standard of Review**

Summary judgment is a "salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action."[10] The summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the 'just, speedy and inexpensive determination of every action.'"[11] But summary judgment is also "a lethal weapon capable of overkill,"[12] and "a trial often establishes facts and inferences not gleanable from papers submitted pre-trial,"[13] so courts have concluded that they "should act with caution in granting summary judgment and may deny it if there is reason to believe that a full trial is warranted."[14]

On a motion for summary judgment, "the party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact,"[15] and so any inferences drawn from the facts "must be viewed in the light most favorable to the party opposing the motion."[16] "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden, then 'summary judgment must be

---

[10] *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotation marks omitted).
[11] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).
[12] *P.R. Burke Corp. v. United States*, 58 Fed. Cl. 549, 553–554 (2003) (*quoting SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985)).
[13] *SRI Int'l*, 775 F.2d at 1116.
[14] *P.R. Burke Corp.*, 58 Fed. Cl. at 553.
[15] *Heger v. United States*, 103 Fed. Cl. 261, 265 (2012).
[16] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

denied even if no opposing evidentiary matter is presented.'"[17]

**Argument**

Ample law and evidence, including the Quapaw Analysis, support the Quapaw's equitable Congressional Reference claims.  An equitable claim is one in which there is either no enforceable legal remedy or an inadequate legal remedy:

> [G]enerally speaking, an equitable claim involves an injury occasioned by Government fault for which there is either no enforceable legal remedy—due, for example, to the bar of sovereign immunity or the running of the statute of limitations,or the legal remedy that does exist is inadequate to accord the full measure of relief claimed due. In these situations, it is not the sanction of positive law that directs the outcome but considerations of moral responsibility—"what the Government ought to do as a matter of good conscience." The critical determinant—that without which an equitable claim does not exist—is the notion of Government fault: "defendant's liability must rest on some unjustified act or omission to act which caused plaintiffs' damage; otherwise any award would be a pure gratuity."[18]

The Government's motion for summary judgment ignores its statutory and regulatory duties identified and discussed in the Quapaw Analysis, known to the Court and parties through previous briefings in this litigation, including the Government's motions to dismiss in 2013 and the Quapaw's pending motion for partial summary judgment. The Quapaw Analysis contains a separate section of legal duties owed by the United States to the Quapaw.[19] The Government's assertions that Claimants have failed to identify any legal duties that support the claims for town lot collections, agricultural

---

[17] *Robinson v. Valdamudi*, No. 9:10-CV-01442 GTS, 2013 WL 877398, at *1 (N.D.N.Y. Jan. 31, 2013) (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)).

[18] *White Sands Ranchers of N.M. v. United States*, 14 Cl. Ct. 559, 565 (1988), *opinion adopted in part*, 16 Cl. Ct. 13 (1988) (citations omitted).

[19] Quapaw Analysis at appx. 1, 134–55; *see also, e.g.*, Pls.' Opp. to Mot. to Dismiss at 7, 14, 28–29 (Nov. 26, 2012) (*Goodeagle* Doc. 11).

and hunting leases, and the Catholic Forty damage claims thus cannot withstand even a

cursory review.

### I.      The Government breached its duty of trust owed to the Quapaw by deeding 40 acres of land held in trust for the Quapaw Tribe to the Catholic Church, thereby extinguishing the trust title and reversionary interest the Tribe held in the land and minerals on the 40 acres

The Government's first argument is that it could not be liable for unpaid mining

royalties and resulting environmental damages on the Catholic Forty parcel because the

land was then owned by a third party, the Catholic Church. But the Government omits the

critical fact that the Church held title because in 1908 the Government conveyed the

Catholic 40 to the Church, without compensation—a direct violation of both its duty of

trust and the Fifth Amendment:

> The tribe was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government. But this power to control and manage was not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it was subject to limitations inhering in such a guardianship and to pertinent constitutional restrictions. It did not enable the United States to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them; for that 'would not be an exercise of guardianship, but an act of confiscation.[20]

This conveyance, without compensation and without retaining a right of reversion

when the property ceased to be used for school purposes, was a Fifth Amendment taking,

imposing a duty on the United States to pay just compensation:

> The act of patenting appellant's land to the Mission, without any compensation to the Indians, constituted a taking under the Fifth

---

[20] *United States v. Creek Nation*, 295 U.S. 103, 109–10 (1935).

Amendment, for which appellant is entitled to just compensation.[21]

The United States should have retained title to the land and minerals, in trust for the Quapaw—not transferred them to a third party (the Catholic Church). Or, at a minimum, title should have reverted in 1927 when the land ceased being used as a school for Quapaw children. The Government's 1908 conveyance of this mineral-rich Quapaw land, without compensation, was wrongful, and the lost revenues from the land while it was in the hands of the Catholic Church is a damage to which the Quapaw are equitably entitled. As the Supreme Court has held,

> tribal lands are subject to Congress' power to control and manage the tribe's affairs. But the court must also be cognizant that "this power to control and manage [is] not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it [is] subject to limitations inhering in . . . a guardianship and to pertinent constitutional restrictions.[22]

In 1908, without the Quapaw's knowledge, the Government deeded the Catholic Forty to the Catholic Church, allowed the Church to make profitable use of the Quapaw's land, and to collect mining royalties that should have been paid to the Quapaw because the land had been held in trust by the United States for the Quapaw. The Quapaw Analysis specifically states that the United States' transfer of the Catholic Forty by fee patent deed in 1908 was without the Tribe's knowledge or permission:

> The Quapaw Tribe was unaware that a fee patent was issued in 1908 on the SW NE Sec.6-T28N-R24E, which extinguished the trust title and the reversionary clause, as prescribed by the original indenture given by the Quapaw Council to the Bureau of Catholic Indian Missions. The Secretary of the Interior thus appears to have disregarded his duty to restore title of the Catholic Mission Land to the Tribe after the school and church no

---

[21] *Fort Berthold Reservation*, 182 Ct. Cl. at 563–64.
[22] *United States v. Sioux Nation of Indians*, 448 U.S. 371, 415 (1980).

longer existed. The Tribe repeatedly contacted Catholic Church officials for return of ownership of their land. The Project Team could find no efforts or support offered by the DOI. While it held the property, the church removed lead and zinc ore from the premises, sold chat, and left a huge pile of chat on the property. The BIA made a chat lease in 1977 on these 40 acres. The agreement was never carried out, and there has not been any government supervised activity on this property since then. Eventually, the Tribe was able to have the tract (excepting the cemetery) returned to trust status. Today, however, due to the Church's 68-year span of ownership, the tract is an unusable wasteland.[23]

The only possible legitimate claim the Catholic Church had to the land was to use the land for educational purposes. And for many years Quapaw children were schooled on the reservation by Roman Catholic priests and nuns. The Quapaw Analysis states that "[i]n 1893, the National Council of the Quapaw Tribe made an indenture to the Catholic Church under which forty (40) acres of Tribal land was set aside for the benefit of the Quapaw People, as long as the land was used for school purposes."[24]

But the Catholic Church abandoned use of the land for that purpose in 1927. It was then that the land should have reverted back to the Tribe.

But in 1908 the Secretary of Interior, as trustee for the Tribe, signed a patent deed giving fee title to the Catholic Church, free and clear of any restrictions on use, the land stayed in the Church's ownership, and the Tribe did not regain possession of the property until 1975.[25] During the time that the Church owned the 40-acre parcel, significant mining occurred. But all of the royalties earned from mining and chat sales on the Catholic Forty went to the Church, and not the Tribe.  Accordingly, the Quapaw Analysis

---

[23] Quapaw Analysis at 37.
[24] Quapaw Analysis at 37.
[25] Quapaw Analysis at 40.

concluded:

> [T]he royalty realized by the Catholic Church from removal of lead, zinc and chat from 1937 to 1975 is a valid damage due and owing to the Tribe. The Project Team has thus calculated the amount of lead and zinc that was known to be removed from the premises of this 40-acre tract, as well as the amount of chat sold.[26]

As the Quapaw Analysis reports:

> The Catholic Mission Land is a 40-acre tract of land. Of this, 24.44 acres are pasture land, 15 acres are covered with mine wastes or "chat," and 0.56 acres are a Quapaw Indian cemetery. This land was set aside for The Tribe's benefit, although it was in the Catholic Church's possession for some 80 years. The church used this land for school and church purposes (Pictures 93-95) until 1927, then participated in mining operations and other activities on the tract until 1975.[27]

The Quapaw Analysis determined that the Tribe had incurred significant monetary losses resulting from the Government's wrongful deeding the Catholic Forty to the Church:

- The Catholic Church was paid a base Royalty for a mining lease applicable to the Catholic Mission Land in the amount of $4,524.32 in 1937.

- Chat sales applicable to the Catholic Mission Land were determined to be $7,336.27 prior to 1969, and additional chat sales were determined to be $2,824.63 for the year 1969.

- Loss Due to Additional Costs Anticipated to Return the Catholic Mission Land Cemetery to Trust Status $57,500.

- Agricultural leasing losses of $155,189.[28]

The Government cannot read the Quapaw Analysis without realizing that the

---

[26] Quapaw Analysis at 37.

[27] Quapaw Analysis at 37.

[28] Pls/Claimants' Mot. for Partial Summ. J. at 8 (June 27, 2016) (*Quapaw Tribe* Doc. 153).

Quapaw have identified the 1908 deed transfer of the property as a "negligent or wrongful act"[29] by the Government that caused damage to the Quapaw. The Catholic Church itself in 1975 acknowledged that the 1908 conveyance by the Government was wrongful and contrary to the intent of the Quapaw at that time, and agreed to returned the land to the Quapaw trust:

> Eighty years have elapsed since the tribal land in question was "set apart" by the Quapaw Tribe for a specific use by the Church. . . .

> [T]he basic question . . . is: SHALL WE RETURN THE LAND TO THE QUAPAW TRIBE? It seems to me only one answer is possible in all justice and charity. In my opinion, it was not the intent of the Quapaw Tribe to transfer the land permanently. Land, to the Indian, is "sacred" and not to be sold, bartered or traded. It is held in trust for God.

> I therefore, recommend that the land be returned to the Quapaw Tribe without cost at the soonest possible date.[30]

The Government's wrongful act damaged the Quapaw's land and precluded the Quapaw from obtaining royalties on minerals mined on that land, as the Quapaw Analysis explains:

> While it held the property, the church removed lead and zinc ore from the premises, sold chat, and left a huge pile of chat on the property . . . .

> The analysis shows the damages that have resulted from non-use and loss of value due to lack of proper trust management and supervision of the Catholic Mission Land.[31]

Because the Government's motion fails to acknowledge, let alone contradict this blatant violation of its trust responsibility and failure to pay just compensation to which the

---

[29] *Menominee Indian Tribe of Wis. v. United States*, 39 Fed. Cl. 441, 457–58 (1997).
[30] Letter from Charles J. Harrington, Diocese of Tulsa, to Bishop Bernard J. Canter at 3 (Apr. 23, 1974) (Quapaw Analysis, Catholic Mission Minerals Land Management Chat Piles Folder Picture 095).
[31] Quapaw Analysis at 37.

Quapaw are constitutionally entitled,[32] the Court should deny its motion for summary judgment and instead grant the Quapaw's pending motion for summary judgment on this same Catholic 40 issue.[33]

## II.    The Government breached its duty owed to the Quapaw by failing to take reasonable steps to insure that town lots were productively leased and for failing to prevent trespassing

The Government's single-paragraph town lot argument does not even address liability, but instead addresses only damages, stating (incorrectly) that "Plaintiffs allege that the United States should pay for hypothetical town lot revenue based on the assumption that all town lots in the Slim Jim, Harry Crawfish, Humbawahtah Quapaw, and Sintahhahhah allotments were leased."[34] The Government is flat wrong—the Quapaw never say this.

The Quapaw Analysis used appraisal values that factored in a vacancy rate of 20–40%.[35] And the evidence the Government cites, Exhibit 2 to its brief, the expert report of CPA Steven Jay, explains that the Quapaw's town lot damage calculation "factor[s] in a vacancy rate of 20–40%."[36] Because this factually incorrect argument is the only argument the Government makes regarding town lots, the Court should deny its motion and instead grant summary judgment to the Quapaw on their town lots claim, as

---

[32] *Fort Berthold Reservation*, 182 Ct. Cl. at 557.

[33] Pls./Cls.' Mot. for Partial Summ. J. on Remaining Quapaw Analysis Claims (Pls./Cls.' Mot.) (June 27, 2016) (*Quapaw Tribe* Doc. 153).

[34] Def.'s Mem. at 6 (July 15, 2016) (*Bear* Doc. 142-1) (citing Def.'s Br. Ex. 2, Jay Rep. at 10–11 (*Bear* Doc. 142-3)).

[35] Quapaw Analysis at 128.

[36] Jay Rep. at 10 (Apr. 13, 2016), *available at* Def.'s Br. Ex. 2 (*Bear* Doc. 142-3).

described in the Quapaw Analysis.[37]

As the Quapaw explained in earlier briefing in this litigation, and as explained in the Quapaw Analysis, the United States has a duty as trustee to protect restricted or trust property owned by the Quapaw:

> The Quapaw Indians are under the guardianship of the United States. The land and Indian owners are bound by restrictions specified in the patent and the acts referred to. It is the duty and established policy of the government to protect these dependents in respect of their property. The restrictions imposed are in furtherance of that policy.[38]

Congress authorized the Secretary of the U.S. Department of the Interior to lease Quapaw lands as town lots or otherwise permit town lot development and imposed on the Secretary the duty to collect rents and royalties from leasing of these lots.[39] Under a comprehensive regulatory and statutory scheme, including 25 C.F.R. § 162.108 and its predecessor regulations, the United States has throughout the relevant period for the town lot claims in this litigation, a fiduciary duty and a trust obligation to:

- [E]nsure that tenants meet their payment obligations to Indian landowners, through the collection of rent on behalf of the landowners and the prompt initiation of appropriate collection and enforcement actions.

- [A]ssist landowners in the enforcement of payment obligations that run directly to them, and in the exercise of any negotiated remedies that apply in addition to specific remedies made available to [the United States] under these or other regulations.[40]

In response to the Government's 2013 motion to dismiss, the Quapaw explained

---

[37] Pls./Cls.' Mot. at 31–35 (June 27, 2016) (*Qupaw Tribe* Doc. 153).
[38] *Jaybird Mining Co. v. Weir*, 271 U.S. 609, 612 (1926).
[39] *See* Act of March 3, 1921, 41 Stat. 1225, 1248–49 (1921).
[40] Cong. Ref. Compl. ¶ 51 (Mar. 25, 2016) (*Bear* Doc. 4) (quoting 25 C.F.R. § 162.108).

why its breach of trust claims for town lot collections rest on a statutory duty:

> As the Government well knows (and certainly does not deny in its motion), 25 U.S.C. § 162a(d)(8) provides that "[t]he Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following: (8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands." 25 U.S.C. § 2218 further provides that "[n]otwithstanding any other provision of law, the Secretary may approve any lease or agreement that affects individually owned allotted land or any other land held in trust or restricted status by the Secretary on behalf of an Indian."

This Congressional Reference case presents two equitable claims related to town lots, neither of which is addressed by the Government's motion for partial summary judgment: The Government breached its trust obligations to the Quapaw by charging below-market rent for the town lots it leased and made many of the lots unrentable by covering them with mining waste.[41] Because the Government's motion does not even address these claims—the equitable claims the Quapaw actually do make—it should be denied, and the Court should instead grant the Quapaw's previously filed motion for summary judgment on these town lot claims.[42]

In addition, as the moving party, the Government "bears the burden of demonstrating the absence of any genuine issue of material fact"[43] and "[i]f the evidence submitted in support of the summary judgment motion does not meet the movant's burden, then 'summary judgment must be denied even if no opposing evidentiary matter

---

[41] Cong. Ref. Compl. ¶¶ 49–59 (Mar. 25, 2016) (*Bear* Doc. 4); Quapaw Analysis at 94–96.
[42] Pls./Cls.' Mot. at 31–35 (June 27, 2016) (*Quapaw Tribe* Doc. 153).
[43] *Heger*, 103 Fed. Cl. at 265.

is presented.'"[44] The Government ignores its burden under Rule 56 by relying only on its

conclusory statement that "Plaintiffs [Claimants] offer no evidence that all town lots were

leased"[45]—but it is the Government who is moving for summary judgment and so it is the

Government, by "citing to particular parts of materials in the record,"[46] who must

establish that Claimants could not offer any disputed evidence at trial.[47] The Government

makes no effort at all to demonstrate a lack of disputed material facts to support its

motion for town lots, ignoring the Quapaw Analysis and the substance of the Quapaw's

expert reports.

In contrast, the Quapaw's claim for lost town lot revenue is based squarely on the

findings of the QIS team, which analyzed 160 acres of Slim Jim's Allotment, specifically

the Comba and Shorts Additions of the town of Picher.[48] "[T]he Project Team created

worksheets tracking all the monies received each year for all the lots on all of the blocks

in both of tehse additions from 1922 to 1983 (the last year for which there are records of

any monies beingh received)."[49] The Project Team also reviewed rental rate data from

historical documents within the document collection in order to establish a base rental

values, factoring in a 20-40% vacancy rate.[50] The Quapaw Analysis states:

> The Project Team identified the leasing of Quapaw town lots as an issue
> because the records—or lack thereof—reveal a pattern of neglect in the

---

[44] *Robinson*, 2013 WL 877398, at *1 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)).
[45] Def.'s Mem. at 6 (July 15, 2016) (*Bear* Doc. 142-1).
[46] RCFC 56(c)(1)(a).
[47] *Heger*, 103 Fed. Cl. at 265.
[48] Quapaw Analysis at 128.
[49] Quapaw Analysis at 128.
[50] Quapaw Analysis at 128.

management of this trust property for the benefit of its Indian owners that has been allowed to continue since 1918. Adequate and accurate records were never maintained on these lots. The community that came to be known as the City of Picher, Oklahoma, was the heart of the "mining district." When lead and zinc were discovered in 1902, miners began squatting in tents, cabins and houses in and around this area. No rental was collected for the trust owners prior to 1918. . . .

The Project Team has made comparisons of the actual rental payments (Official Receipts) against the town lot cards that were made available. There were 14,500 town lots on trust allotments by 1928. The Project Team did not receive any type of payment history for years 1949 to 1962 or from 1982 to present, and it only received 3,500 town lot cards in all. There were very few active permits in 2006 and the majority of those had huge amounts of back rent due.[51]

Another of the Quapaw's expert witnesses, Karole Overberg, a retired Bureau of Indian Affairs official, who has over 25 years of experience working on the entire range of realty issues for the BIA, and who served as a member of the QIS team helping to prepare the Quapaw Analysis, states in his expert report that the Quapaw Analysis properly conservatively estimated the vacancy rates for town lots, noting that the BIA never implemented a system to address the problem of tresspasers or squatters:

Government reports that I have reviewed confirm that collections for the Quapaw town lots leases never exceeded 50% and that even those collections were at well below fair market value. The Government also failed to address squatters and trespassers on restricted Quapaw land. Government reports show that they knew of squatters and trespassers but never implemented any system to collect rent or evict them for failure to obtain a lease or permit. In my opinion, the Government's failure to collect was caused in large part by the fact that the Government never allocated the necessary resources to manage the situation. The BIA, therefore, never had sufficient manpower to ensure that town lot rents were collected and to address the problem of squatters and trespassers.

It is also my opinion that the methodology for town lot losses set forth in the Quapaw Analysis properly analyzes the losses the Quapaw incurred

---

[51] Quapaw Analysis at 94.

resulting from the Government's failure to properly collect town lot rents. The damage figure is, in fact, very conservative in my opinion based on the extent of the problem as stated in Government reports and correspondence.[52]

The Quapaw Analysis used several other measures to reach a conservative estimate of the losses the Quapaw suffered from the Government's mismanagement of their town lots, further refuting the Government's incorrect assertion that no evidence supports the Claimants' town lot claim in *Bear*. The Quapaw Analysis estimated "the ratio of developed lots to undeveloped lots" using a 1939 aerial photograph and adjusted its rental estimate accordingly.[53] The Quapaw Analysis undertook an "in-depth town lot analysis"[54] of 160 acres of the Slim Jim Alottment in Picher, reviewing "rental rate data from historical documents within the document collection in order to establish a base rental value."[55]

In its one-paragraph town lot argument, the Government falls far short of proving its argument, and even fails to mention, much less discuss, Overberg's expert report, and fails to mention, much less discuss, the Quapaw Analysis, which details the analysis of the town lot leasing claims at issue in *Bear*. The Government cannot prevail by simply ignoring the uncontradicted evidence that it has badly mismanaged the Quapaw's town lot properties, resulting in substantial rental losses to the Quapaw—an equitable claim proved by the Quapaw Analysis.

---

[52] Overberg Rep. at 1 (Apr. 13, 2016), *available at* Pls./Cl.'s Opp. to Mot. to Extend Time Ex. 11 (May 3, 2016) (*Quapaw Tribe* Doc. 145-12).
[53] Quapaw Analysis at 128.
[54] Quapaw Analysis at 128.
[55] Quapaw Analysis at 128.

III.    **The Government breached its duty owed to the Quapaw by failing to take reasonable steps to insure that agricultural land was productively leased**

As early as 1891 Congress authorized the Government, which held title to tribal land in trust for the Quapaw Tribe, to lease unallotted Indian lands for farming or mining, subject to approval by the Secretary of the Interior.[56] In 1894, Congress authorized the leasing of excess tribal lands under similar terms.[57] In 1926, Congress gave tribal governing bodies authority to lease unallotted irrigable lands for agriculture, but only under rules and regulations of the Secretary.[58] And, under a 1993 statute, the Secretary still must approve agricultural leases on Indian lands.[59]

Other regulations imposed duties on the Secretary with regard to agricultural leasing of Quapaw land, as identified in the Quapaw Analysis.[60] "Leases of incompetent adults and of minors . . . should be negotiated by the Superintendent and the rental paid to him for deposit to the allottee's credit as individual Indian moneys."[61] Competent adult Indians "may be permitted to negotiate their own leases" but "[a]ll such leases, however, must be approved by the Superintendent."[62] The Secretary also had to ensure that "[a]llotted Indian lands should be leased only to the manifest advantage of the owners."[63]

Likewise, the Secretary had to obtain the best market value for rentals: "The rental value of land to be leased through the agency should be carefully appraised by a

---

[56] 25 U.S.C. § 397, 26 Stat. 794 (Feb. 28, 1891).
[57] 25 U.S.C. § 402, 28 Stat. 286, 305 (Aug. 15, 1894).
[58] Act of July 3, 1926, § 787, 44 Stat. 894 (codified at 25 U.S.C. § 402a (1926 Supp.)).
[59] 25 U.S.C. § 3715, 107 Stat. 2017 (Dec. 3, 1993).
[60] Quapaw Analysis at 13–55, appx. 1.
[61] 25 C.F.R. § 171.2 (1938) (attached as Ex. 1).
[62] *Id.* § 171.4 (1938) (attached as Ex. __).
[63] *Id.* § 171.5 (1938) (attached as Ex. __).

competent employee versed in land values and every effort made to obtain the highest

possible rental therefor (not less than the appraisal) by so advertising as to obtain the

most competition possible."[64] As to agricultural land leases, the Secretary had

considerable discretion: "The letting of tribal lands for farming, grazing, or business

purposes shall be accomplished through leases for stated periods, or through permits

revocable in the discretion of the Commissioner of Indian Affairs, after advertising as

provided for in § 171.9."[65]

The Secretary, acting through the Superintendent, also had a duty to enforce lease

contracts: "The Superintendent should make every effort to see that lessees and

permittees comply with the regulations and the terms of their contracts."[66] Farmland

leases required "a lien clause upon all crops, implements, livestock, or other property of

the lessee on the premises as a security for the payment of the rental and the performance

of the contract" and "[t]he description of the land, the kinds of crops, and the acreage

involved must be recited" to secure a chattel mortgage.[67] The Superintendent had the

authority and obligation, after seizing mortgaged property, to "report the facts to the

Commissioner of Indian Affairs."[68] The Secretary also had the duty to ensure that leases

"provide the land with such permanent improvements as will best fit it for the eventual

use and occupancy of the allottee," and that any such improvements "remain on the land

---

[64] 25 C.F.R. § 171.9 (1938) (attached as Ex. 1).
[65] *Id.* § 171.12.
[66] *Id.* § 171.18.
[67] *Id.* § 171.21.
[68] *Id.* § 171.21.

and become the property of the allottee."[69]

The Secretary's failure to perform these duties is a breach of trust, creating an equitable claim (the legal claim being barred by the statute of limitations) for which the Tribe may recover damages. The United States took control of how tribal members could lease their agricultural property and controlled the rents received from such leases—thus meeting the Supreme Court's test for the existence of a fiduciary duty.[70] These statutes and regulations may not use the word "trust" but they unquestionably impose a host of duties on the Secretary with regard to Indian agricultural land, which is sufficient to establish a trust duty.[71] And the Government's mismanagement of the Quapaw's agricultural lands is a negligent or wrongful act sufficient to support their claim in this Congressional Reference case.

As the Quapaw discussed in their pending motion for summary judgment, the Quapaw Analysis used a sophisticated agricultural leasing model to determine the income that should have been derived from the Catholic 40 but was not because of the Secretary's breaches of trust.[72] The Government raises no triable issue of fact regarding liability (that the land could not be used or leased for agriculture), but only as to damages—an issue on which the Government bears the burden of proof,[73] but which it

---

[69] 25 C.F.R. § 171.24 (1938) (attached as Ex. 1).

[70] *See Cobell v. Norton*, 240 F.3d 1081, 1098 (D.C. Cir. 2001).

[71] *See Moose v. United States*, 674 F.2d 1277, 1281 (9th Cir. 1982); see also *Oenga v. United States*, 91 Fed. Cl. 629, 639-40 (2010) (holding that a similar set of leasing and permitting regulations imposed a fiduciary duty).

[72] Quapaw Analysis at 106.

[73] *Confederated Tribes of Warm Springs Reservation of Or. v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001) ("It is a principle of long standing in trust law that once the

has failed to sustain. The Government's expert, Hudson, provides no estimate of his own of the amount of agricultural lease revenue the Quapaw lost as a result of the Secretary's breach of trust—thus failing to satisfy the Government's burden of proving the Quapaw's losses,[74] failing even to create a triable issue of fact. The Tribe thus is entitled to have the Court report to Congress that it is entitled to damages set forth in the Quapaw Analysis (and summarized by CPA Jay), totaling $615,446 for the Catholic 40 and Industrial Park land, plus lost investment income.

**A.      The Quapaw do not claim that the Government must insure that all agricultural lands are leased**

As with town lots, the Government sets up a straw man argument when it seeks summary judgment on an assertion, which the Quapaw do not make, that the United States "owe[s] a duty to ensure that all agricultural lands are leased."[75] What the Quapaw Analysis actually states—and the equitable claim on which the Quapaw are entitled to prevail—is that the Government, in leasing Quapaw lands for mining, owed a duty to insure that the Quapaw's valuable agricultural lands were not covered in toxic mining waste, making them unusable for agriculture:

> The Quapaw trust and restricted Indian lands contained in the individual and Tribal allotments studied in this Project have been damaged and depleted by mining policies and practices. As a result, much of the land is now covered in toxic chat. In addition to the negative impacts of mining, these lands have also been poorly managed, and underutilized as productive agricultural assets. With proper management these lands could have been much more financially beneficial to their Indian owners, the same Indian

---

beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee.").
[74] *Confederated Tribes of Warm Springs Reservation*, 248 F.3d at 1372.
[75] Def.'s Mem. at 6 (July 15, 2016) (*Bear* Doc. 142-1).

owners whom the DOI and BIA are entrusted with serving. Historical research demonstrates the Quapaw Tribe's ability to operate farms and establishes that prior to mining this land was considered prime farm land with high crop potential.[76]

The Quapaw Analysis team carefully identified the agricultural lands that, because they were covered with mining waste, would not grow crops:

> The first step in this process was locating and determining the amount of agricultural land contained in each allottee's parcels. We used high resolution aerial images and Arcview Software to carry out our digital ortho-quarterquad analysis of each allotment. We deducted acreage related to roads, railroads, buildings, lakes and streams from the potential agricultural acres for each parcel. We determined any acreage in a riparian area as an input into the Pecan Enterprise option. Any acres included for Pecan Enterprise were deducted from the total acres available for any of the other Ag uses. Review of historical documents demonstrated that prior to and absent from mining impact, the Quapaw Tribal land supported the growing of wheat, corn, soybean, hay and other crops. The first model considered only a hay enterprise. The second model we looked at was a wheat, corn, soybean, and fallow rotation enterprise. Finally, we calculated a model based only on land rental rates.[77]

The Government's motion offers no rationale for why the Government, as trustee of the Quapaw's agricultural lands, was entitled to destroy them by allowing mining companies, under leases from the Government, to dump toxic mining waste on these lands, nor to allow squatters to occupy them without paying rent. These acts, fully documented in the Quapaw Analysis, form the basis of the Quapaw's equitable claims for agricultural lands.

> The Project Team identified the management of the surface land or land for agricultural purposes as an issue because the examination of the leases, permits, and contracts made between 1957 and 2004 reveal a plethora of cases that illustrate the DOI's failure to uphold its fiduciary duty on non-

---

[76] Quapaw Analysis at 108.
[77] Quapaw Analysis at 115.

monetary trust assets located on selected Quapaw Tribal and Individual trust lands.[78]

The Government mischaracterizes the Quapaw's claim as one that requires "that all agricultural lands are leased."[79] But the Quapaw Analysis does not assume that all agricultural parcels were leased, but instead relies on average production rates from Ottawa and Cherokee Counties:

> To determine expected hay yield we referred to the USDA Economic Research Service and the Ottawa County and Cherokee County soil surveys for forage on loamy prairie soils. That research indicated that average production in favorable weather was 7,500 pounds per acre and 4,000 pounds in unfavorable weather. The model used an average production of 5,750 pounds or 2.875 tons of hay per acre. (Ottawa County Soil Survey 1978.)
>
> . . .
>
> Studies conducted by the Sustainable Agriculture Research and Education ("SARE") program, with funding by USDA's Cooperative State Research, Education and Extension Service showed native pecan production between 500 and 1000 pounds per acre. The average net income in 2005 for native pecan production was estimated at $100 per acre. . . . Note that the pecan model assumes that native orchards were grown on fifty percent of the riparian acreage measured.[80]

The Quapaw Analysis also estimated three levels of rental values for crop land, stating that "[t]his [Rental Enterprise] model was developed using information collected from Ottawa and Cherokee County Extension, real estate agents, and Oklahoma State University. We included three rental values: minimum ($20), average ($35), and maximum ($40) for crop land . . . ."[81]

---

[78] Quapaw Analysis at 50.
[79] Def.'s Mem. at 6 (July 15, 2016) (*Bear* Doc. 142-1).
[80] Quapaw Analysis at 119–20.
[81] Quapaw Analysis at 120.

The Quapaw Analysis also used aerial images to limit its analysis to agricultural land that would actually be used for production in the absence of chat contamination. The use of average production rates and tiers of rental values—based on real-world estimates—provides a conservative estimate of agricultural production on Quapaw land that accounts for the possibility that not all agricultural land would be leased at all times. The Government also ignores that these damages account not just for the possibility of renting farmland to others, but also for the damages to the Quapaw themselves (described historically as excellent farmers)[82] from being unable to farm their own land.

### B.     The Quapaw do not claim that the Government has a duty to issue hunting leases

In yet another straw man argument, the Government states that the United States does not "owe a duty to ensure that overlapping hunting leases are executed on top of the agricultural leases."[83] But the Quapaw make no such claim; their only mention of hunting leases is in the context of an expert report on damages, which makes the unremarkable point that owners of croplands frequently produce additional revenue by allowing hunting on their lands.[84] This is a damages issue on which the government has the burden of proof,[85] not a liability issue—and it will not support the Government's motion for summary judgment on the Tribe's agricultural land loss claim.

The Government offers no evidence to support its argument that hunting leases

---

[82] Quapaw Analysis at 115.
[83] Def.'s Mem. at 6 (July 15, 2016) (*Bear* Doc. 142-1).
[84] Duffield Rep. at 9 (Apr. 13, 2016) *available at* Def.'s Mot. for Enlargement Ex. 4 (April 25, 2016) (*Quapaw Tribe* Doc. 142-4).
[85] *Confederated Tribes of Warm Springs Reservation*, 248 F.3d at 1371.

could never overlap with agricultural leases to provide extra income for the Quapaw, and any such suggestion is contrary to the findings described in the Quapaw Analysis.[86] The Quapaw Analysis describes how "[w]ildlife observation, hunting, and fishing are important to the Quapaw."[87] The Quapaw Analysis did not assume hunting (and other recreational use) would occur on all land, as the Government again erroneously contends, but only on a limited set of parcels:

> Additionally, we included consideration for lost revenues from recreational use both in riparian and non-riparian lands. We used data for hunting leases in Oklahoma and Kansas to calculate this loss. We determined that the average hunting and fishing lease for Northeast Oklahoma was $7.73 per year. The average of several hunting leases posted on the Nobel Foundation Hunting Lease Registry was used. Only parcels of twenty or more contiguous acres were included in the recreational lease analysis, and the total number of acres available in a parcel was reduced by 5 acres to adjust for a possible homestead on that parcel. The recreational lease damages are separately presented as one value added enterprise option that could benefit the Indian owners while preserving and protecting the natural resources of the trust lands.[88]

The Government also ignores the fact that agricultural land is often used by hunters because agricultural fields attract game. For instance, a 2014 study cited in *Game and Fish Magazine*, "5 of 10 preferred deer foods were farm crops: winter wheat, corn, alfalfa, grass, and lespedeza."[89] That same article noted that "deer concentrations can be up to 10 times higher in the vicinity of agricultural crops than in more remote wooded

---

[86] Def.'s Mem. at 6 (July 15, 2016) (*Bear* Doc. 142-1). The Government never explicitly states that hunting leases could not be used on land already leased for agricultural purposes, possibly because it has no evidence on this point. *See id.*

[87] Quapaw Analysis at 114.

[88] Quapaw Analysis at 117.

[89] Keith Sutton, *The Keys to Access & Hunt Farmland Deer*, GAME & FISH MAGAZINE, Oct. 29, 2014, *at* http://www.gameandfishmag.com/hunting/deer/access-hunt-farmland-deer/.

areas."[90]

In sum, the Government provides no reason why the Court should dismiss the

Quapaw's agricultural land loss claim. To the contrary, the Court should grant the

Quapaw's motion for summary judgment on this claim, as fully documented in the

Quapaw analysis, because the government has provided neither law nor disputed any

issue of fact on this claim.

**IV.    CERCLA does not provide an adequate legal remedy for the Quapaw's natural resources damages claim**

The Government incorrectly argues that for natural resource damages the Quapaw

"has an adequate legal remedy, but it is simply not ripe yet."[91] But the legal claim

CERCLA provides does not encompass the damages the Quapaw seek in this

Congressional Reference case nor, because it will not be ripe for another 30 years or

more, can that legal remedy be considered adequate. As this Court has stated, an

equitable claim exists when the claimant has no enforceable legal remedy:

> The term "equitable claim," however, has a particular meaning when used
> in congressional reference cases. In general, an equitable claim involves an
> injury, caused by the government, for which there is no enforceable legal
> remedy—due, for example, to the sovereign immunity bar or the running of
> the statute of limitations period.[92]

But for a legal claim to exist, there must be a viable legal remedy, and where a

claim is barred on statute of limitations or sovereign immunity grounds, it is not a legal

---

[90] Keith Sutton, *The Keys to Access & Hunt Farmland Deer*, GAME & FISH MAGAZINE,
Oct. 29, 2014, *at* http://www.gameandfishmag.com/hunting/deer/access-hunt-farmland-
deer/.

[91] Def.'s Mem. at 8 (July 15, 2016) (*Bear* Doc. 142-1).

[92] *Bear Claw Tribe, Inc. v. United States*, 36 Fed. Cl. 181, 186 (1996) (citations omitted),
*aff'd*, 37 Fed. Cl. 633 (1997).

claim.[93] In such circumstances, however, relief may still be possible on equitable grounds.[94]

In the case cited by the Government,[95] *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*,[96] the district court dismissed the Quapaw Tribe's natural resources damages claim on ripeness grounds, holding that the claim would not be ripe until after EPA completes its cleanup remedy at the Tar Creek superfund site:

> ("[C]ustomarily, natural resource damages are viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup. As a residue of the cleanup action, in effect, they are thus generally not settled prior to a cleanup settlement."). This Court has not found any authority permitting a natural resources trustee to file a natural resource damages claim under CERCLA while remedial work is underway at a Superfund Site.[97]

Tar Creek was designated as a Superfund site in 1983, and EPA began work on the site in 1984.  Now, over three decades later, the Government's Rule 30(b)(6) spokesman, Meyer, testified at deposition, EPA projects that its cleanup work on Operable Unit 4 (mining waste cleanup) will not be completed for another 30 years[98] and EPA has no firm estimate of when it will even start work on Operable Unit 5.[99]

---

[93] *J.L. Simmons Co., Inc. v. United States*, 60 Fed. Cl. 388, 394 (2004).

[94] *Bear*, 112 Fed. Cl. at 485.

[95] Def.'s Mem. at 7 (July 15, 2016) (*Bear* Doc. 142-1).

[96] *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, No. 03-CV-0846-CVE-PJC, 2008 WL 2704482 (N.D. Okla. July 7, 2008).

[97] *Blue Tee Corp.*, 2008 WL 2704482, at *10 (quoting *Utah v. Kennecott Corp.*, 801 F. Supp. 553, 568 (D. Utah 1992)).

[98] Meyer Dep. 20:14–17 (Feb. 17, 2016) (attached as Ex. 2) ("Q. Okay. So we would expect— so the plan was that the remedy for Operable Unit 4 would be completed about 30 years after 2010? A. That was the projected time frame.).

[99] *Id.* at 45:9–11, 14, 16–18 ("Q. When will EPA be at a point that it can enter a Record of Decision or a Decision of Record, I suppose, for Operable Unit 5? . . . A. I don't know.

In short, the Quapaw's legal remedy under CERCLA is at present barred by the jurisdictional ripeness doctrine, because the claim does not presently exist—and will come into being, if at all, no earlier than the year 2038. The Government cites no authority that the prospect of such a contingent legal remedy so far in the future requires dismissal of a Congressional Reference case. Nor does the CERCLA remedy duplicate the Quapaw's breach-of-trust claim for damage to natural resources, as the Government argues. As the *Blue Tee* court stated, the CERCLA remedy allows only recovery for restoration or replacement of natural resources, plus loss-of-interim-use: "The Tenth Circuit has interpreted § 9607(f)(1) to permit recovery for restoration or replacement of natural resources and for 'damages due to interim loss of use.'"[100]

Nor is the CERCLA remedy identical to the Quapaw's claim in this case, as the Government argues.  The CERCLA remedy does not include the diminution in the value of Quapaw lands due to contamination, nor lost rents from contaminated agricultural lands and town lots, nor the value of traditional hunting, fishing and subsistence food-gathering—all of which the Quapaw seek in this case. And the Quapaw do not seek damages for restoration or replacement of their natural resources (the primary CERCLA natural resource remedy) because they have only one reservation, granted them by treaty, which cannot be replaced or substituted.  At most there may be some overlap in interim losses due to contamination, but even there the damages the Quapaw seek are not

---

. . . Q. You don't know. Do you have any estimate? A year, ten years, somewhere between? A. I would say it is somewhere between.").

[100] *Blue Tee Corp.*, 2008 WL 2704482, at *10 (quoting *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1244 (10th Cir. 2006)).

measured by CERCLA.

As the Quapaw's appraisal expert witness, Bill Harvey, states in his expert report dated April 13, 2016, this environmental contamination of the Quapaw's land has a substantial negative impact on the value of the land:

> In its current condition, the subject property is significantly impaired by the existing Class IV (legal), Class VII (site and infrastructure) and Class VIII (environmental) detrimental conditions and the property is generally not productive for its beneficiaries. In my opinion, the property will remain unproductive until such time as the hazardous waste and subsidence problems are remediated.[101]

And as Dr. John Duffield, an economist, states in his expert report, the Quapaw's natural resource damages calculations are not limited to the narrow damages analysis used under CERCLA, for in his opinion the damages owed to the Quapaw for the environmental and natural resources damages due to Government's historic mismanagement of mining activities on the land are outside the scope of CERCLA:

> Q.   Okay. But you believe that the same economic modeling that applies to CERCLA actions can be applied to the breach of trust context in these three cases?
>
> . . .
>
> THE WITNESS: [W]here there's no clear regulatory [] guidance or legal guidance on methods or measures in the breach of trust . . . I would look at the regulatory guidance in the [CERCLA] NRDA as at least an example of how you might do this. It's, you know, just guidance. It isn't binding here, but it's maybe efficient to use.[102]

In short, the legal remedy available to the Quapaw under CERCLA is "inadequate

---

[101] Harvey Rep. at 2 (Apr. 12, 2016), *available at* Def.'s Mot. for Enlargment of Time Ex. 9 (Apr. 25, 2016) (*Quapaw Tribe* Doc. 142-9).
[102] Duffield Dep. 66:24–67:2; 67:13–15, 17–21 (July 15, 2016) (attached as Ex. 3).

to accord the full measure of relief claimed due."[103] The Quapaw are unable to bring a CERCLA claim against the United States unless and until the U.S. Environmental Protection Agency completes its remediation efforts, which EPA now estimates will be 30 (or more) years from now.[104]

At this point in the case, the Government cannot deny its duty to protect the environment and natural resources on Quapaw land, which this Court has recognized stating, "[t]he Government had a duty to protect the environment and manage the natural resources on the Quapaw land."[105] The Court also stated:

> The presence of mining waste, toxic dust, and air pollution on Plaintiffs' land is the cumulative effect of the Government's alleged failure to properly manage the land's natural resources and supervise the mining activities thereon. "That failure, and the consequential damages resulting from it, constitute[s] the actionable wrong that [Plaintiffs] seek to vindicate." *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1457 (Fed.Cir.1997).[106]

The Court has already ruled that the Quapaw's claim that the Secretary of the Interior failed to protect the Tribe's natural resources "is not preempted by CERCLA."[107] And although the Court granted the Government's motion to dismiss the Quapaw's environmental damages claim from *Goodeagle* on the ground that the claim was barred

---

[103] *White Sands Ranchers*, 14 Cl. Ct. at 565.
[104] *Blue Tee Corp.*, 2008 WL 2704482, at *13. The Government's citation to *Alaska Sport Fishing* for the quotation on page 7 of the Government's motion is incorrect. The quotation, that "NRD, even interim and lost use damages, cannot be fully measured until the EPA's remedial work is completed," is from the Northern District of Oklahoma's opinion in *Blue Tee*, not the Ninth Circuit opinion in *Alaska Sport Fishing. Compare* Def.'s Mem. at 7 (July 15, 2016) (*Bear* Doc. 142-1), *with Blue Tee Corp.*, 2008 WL 2704482, at *13.
[105] *Goodeagle v. United States*, 111 Fed. Cl. 716, 724 (2013) (*Goodeagle* Doc. 27).
[106] *Goodeagle*, 111 Fed. Cl. at 724.
[107] *Goodeagle*, 111 Fed. Cl. at 723.

by the statute of limitations, the effect of that ruling was to transfer those claims to this Congressional Reference case.[108] And, as this Court later held, "failure to properly manage natural resources and Tribal lands . . . . are precisely the type of equitable claims referred to this Court by House Resolution 668 ."[109]

**Conclusion**

For these reasons, the Quapaw ask that the Court deny the Government's motion for partial summary judgment in the *Bear* Congressional Reference case.

Respectfully submitted,

August 15, 2016                                    s/  Nancie G. Marzulla

Of counsel:                                        Nancie G. Marzulla
                                                   Roger J. Marzulla
Stephen R. Ward, Esq.                              MARZULLA LAW, LLC
John L. Williams, Esq.                             1150 Connecticut Avenue, N.W.
Conner & Winters, LLP                              Suite 1050
4000 One Williams Center                           Washington, D.C. 20036
Tulsa, Oklahoma  74172-0148                        (202) 822-6760 (telephone)
(918) 586-8978 (telephone)                         (202) 822-6774 (facsimile)
(918) 586-8698 (facsimile)                         nancie@marzulla.com
sward@cwlaw.com                                    roger@marzulla.com
jwilliams@cwlaw.com
                                                   Counsel for Claimants

---

[108] *Bear*, 112 Fed. Cl. at 485.
[109] *Bear*, 112 Fed. Cl. at 485–86.

29