# In the United States Court of Federal Claims

No. 13-51X

(Filed: December 3, 2019)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| THOMAS CHARLES BEAR, *et al.*, <br> Claimants, <br> v. <br> THE UNITED STATES, <br> Defendant. | \*  Congressional Reference; Hearing <br> \*  Officer Report; 28 U.S.C. § 1492; 28 <br> \*  U.S.C. § 2509; RCFC Appendix D; <br> \*  Indian Trust; Land Use; Quapaw <br> \*  Nation. <br> \* <br> \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Nancie G. Marzulla*, with whom were *Roger J. Marzulla*, Marzulla Law, LLC, Washington, D.C., *Stephen R. Ward*, *Daniel E. Gomez*, *R. Daniel Carter*, and *C. Austin Birnie*, Conner & Winters, LLP, Tulsa, Oklahoma, for the Quapaw Nation and certain individual claimants.

*Terry J. Barker*, with whom were *Joseph C. Woltz* and *Robert N. Lawrence*, Barker Woltz & Lawrence, Tulsa, Oklahoma, for certain individual claimants.

*Brian M. Collins*, with whom were *Jean E. Williams*, Deputy Assistant Attorney General, *Frank J. Singer*, *Rebecca Jaffe*, *Guillermo Montero*, *Anthony P. Huang*, Environmental Division, Natural Resources Section, United States Department of Justice, *Kenneth Dalton*, *Karen Boyd*, *Ericka Howard*, *Dondrae Maiden*, *Shani L. Walker*, Office of the Solicitor, United States Department of the Interior, and *Thomas Kearns*, Office of the Chief Counsel, Bureau of the Fiscal Service, United States Department of the Treasury, Washington, D.C., for Defendant.

## REPORT OF THE HEARING OFFICER

WHEELER, Hearing Officer:

On May 30, 2012, Congressman Tom Cole of Oklahoma submitted to the United States House of Representatives H.R. 5862, entitled "A Bill Relating to members of the Quapaw Tribe of Oklahoma (O-Gah-Pah)." The bill provided that:

Pursuant to the findings and conclusions contained in the Report issued by the chief judge of the U.S. Court of Federal Claims, the Secretary of the Treasury shall pay, out of money not otherwise appropriated, to members of the Quapaw Tribe of Oklahoma (O-Gah-Pah), the sum of $ _____, and to the Quapaw Tribe of Oklahoma (O-Gah-Pah), the sum of $ _____.

Id.  On December 19, 2012, the United States House of Representatives passed House Resolution 668, referring to the Chief Judge of this Court a bill, H.R. 5862, entitled "A Bill relating to members of the Quapaw Tribe of Oklahoma (O–Gah–Pah)." H.R. Res. 668, 112th Cong. § 1 (2012). Section 1 of the Resolution states:

Pursuant to section 1492 of title 28, United States Code, the bill (H.R. 5862), entitled "A Bill relating to members of the Quapaw Tribe of Oklahoma (O–Gah–Pah)," now pending in the House of Representatives, is referred to the chief judge of the United States Court of Federal Claims for a determination as to whether the Tribe and its members have Indian trust-related legal or equitable claims against the United States other than the legal claims that are pending in the Court of Federal Claims on the date of enactment of this resolution.

Id.  Section 2 of the Resolution contains the proceeding and report instructions to the Court upon receipt of the bill:

Upon receipt of the bill, the chief judge shall—

(1) proceed according to the provisions of sections 1492 and 2509 of title 28, United States Code, notwithstanding the bar of any statute of limitations; and

(2) report back to the House of Representatives, at the earliest practicable date, providing—

(A) findings of fact and conclusions of law that are sufficient to inform the Congress of the nature, extent, and character of the Indian trust-related claims of the Quapaw Tribe of Oklahoma and its tribal members for compensation as legal or equitable claims against the United States other than the legal claims that are pending in the Court of Federal Claims on the date of enactment of this resolution; and

2

(B) the amount, if any, legally or equitably due from the United States to the claimants.

Id. § 2.  The Clerk of the House transmitted H.R. Res. 668 to this Court on January 22, 2013.  Dkt. 1.  The referral was designated Bear v. United States, No. 13-51.

This case proceeded in parallel with two other cases, Goodeagle v. United States, No. 12-431 and Quapaw Nation (O-Gah-Pah) v. United States, No. 12-592, that arose out of the same facts.  Two days before a consolidated trial was to commence, the parties reported that they had "reached an agreement in principle regarding the key terms of a proposed global settlement of [the Plaintiffs'] claims in all three of the pending cases." Dkt. 333 at 2.  The parties subsequently reported that they had finalized their settlement agreement.  E.g., Dkt. 344 at 2.

On October 30, 2019, the parties submitted, through Nancie Marzulla, counsel for the Quapaw Tribe and certain individual claimants, a "Joint Agreement, Stipulation, and Recommendation for Proposed Findings of Fact and Conclusions of Law." Dkt. 347.  That document forms the basis for this report.  A complete copy of the document is appended to this report, along with photographs of the affected land, copies of the parties' settlement agreements disposing of the Goodeagle and Quapaw cases, and a copy of the Congressional Record containing statements in support of the congressional reference.

Findings of Fact

The Hearing Officer, pursuant to Rules of the United States Court of Federal Claims ("RCFC") Appendix 8(a) reports to the Review Panel the following findings of fact:

I.  History of the Case

1. The Quapaw Tribe of Oklahoma (the O-Gah-Pah), a federally recognized Indian tribe, for many centuries made its homeland near the confluence of the Mississippi and Arkansas Rivers in the eastern and south-central portions of the present-day State of Arkansas.  When Europeans first encountered the Quapaw in the 1670s, approximately 15,000 to 20,000 Quapaw lived in villages in this region.  Historically, the Quapaw engaged in agricultural endeavors, and the focus of their lives was on the farming villages.

2. In 1818, under pressure from white settlements and a territorial Government, the Quapaw Tribe signed a treaty ceding most of their land in Arkansas to the United States.  The ceded land included the hot springs area which today is Hot Springs National Park.  In 1824, the United States forced the Quapaw to cede the remainder of its land in

Arkansas, and moved them to an area in northeastern Louisiana on the south side of the Red River. The Quapaw were unwelcome in Louisiana, their lands flooded, and starvation was rampant. The Quapaw became a homeless nation and many of the people returned to their former homeland in Arkansas.

3. Later, the United States again moved the Quapaw Tribe, this time to a more northern location along the present-day border between Oklahoma and Kansas. Under a May 13, 1833 treaty, the United States conveyed to the Quapaw Indians 150 sections of land west of the Missouri state line, between the lands of the Seneca and Shawnee Tribes. Articles of Agreement or a treaty between the United States and the Quapaw Indians, 7 Stat., 424, 425 Art. II (1833). According to the treaty, the United States promised this land to the Quapaw Tribe "in order to provide a permanent home for their nation" and for "as long as they shall exist as a nation or continue to reside thereon." Id. After boundary adjustments following the Civil War, the Quapaw reservation consisted of approximately 56,685 acres (88.57 square miles).

4. By enactment of the Quapaw National Council on March 23, 1893, the Quapaw Tribe self-allotted almost all the Tribal reservation land to individual members of the Tribe. The Tribe carried out the allotments in two phases. The first phase consisted of 200-acre tracts allotted in the fall of 1893, and the second phase consisted of 40-acre tracts allotted in the spring of 1894. Congress ratified all the Tribe's allotment determinations in 1895 subject to various restrictions on alienation to protect the Quapaws. Quapaw Allotment Act, 28 Stat. 876, 907 (1895). Each of the individual Claimants in this case claims to be a successor-in-interest to one or more of these original allotments.

5. In the late 1800s, rich lead and zinc deposits were discovered on Quapaw lands, resulting in a rush to mine and lease these lands. Claimants maintain that the United States exercised comprehensive and elaborate control over the leasing and occupancy of all restricted Quapaw lands for mining, agricultural, residential, and commercial use, and over the disposition of chat, a valuable mining byproduct. The United States disputes these claims.

6. Much of the Quapaw Tribal allotment lands were rich and highly productive farmland. The Quapaw historically grew a wide variety of crops on their lands. They also had a large supply of timber, and grazing land for cattle. Ottawa County, where the Quapaw lands are located, was once known as the Hay Capital of the World.

7. When lead and zinc mining of the area began in the early 1900s, the mining town of Picher, Oklahoma developed largely on the Quapaw Reservation. Picher was incorporated in 1918, and by 1920, Picher had a population of 9,726.

8. The Picher area produced over $20 billion in ore between 1917 and 1947. More than 50 percent of the lead and zinc used during World War I was produced by the Picher district.

9. In 2002, the Quapaw Tribe sued the United States in the U.S. District Court for the Northern District of Oklahoma, in a case captioned <u>Quapaw Tribe of Oklahoma (O-Gah-Pah) v. U.S. Department of the Interior</u>, No. 02-CV-129-H(M) (N.D. Okla.). The Tribe requested an accounting of the historical federal management of the Tribe's trust assets. On November 4, 2004, the Tribe and the United States settled the case. The Tribe and the Government agreed that the Office of Historical Trust Accounting ("OHTA") of the Department of the Interior would contract with Quapaw Information Services, Inc. ("QIS"), a non-profit Tribal entity, to prepare an analysis of the Government's management of Tribal assets and certain individual assets. This analysis became known as the Quapaw Analysis.

10. Claimants note that in settling the trust accounting case, the Quapaw Tribe reserved all claims for money damages arising from past events and transactions, and that the settlement did not purport to compromise or waive the claims of the Tribe or any tribe member for money damages. The United States notes that the settlement agreement did not waive any defenses it might have in response to claims the Tribe might assert in the future, and that each party agreed in the settlement agreement that no party was admitting liability for any claims.

11. QIS investigated and prepared the Quapaw Analysis between 2004 and 2010. QIS examined files and documents made available by OHTA and other agencies to determine whether and to what extent the Department of the Interior met its fiduciary obligations to the Tribe and individual beneficiaries. On June 1, 2010, QIS completed the Quapaw Analysis and sent it to the Government. On November 19, 2010, the Department of the Interior accepted the Quapaw Analysis as satisfying OTHA's contract with QIS.

12. The individual Claimants in this case, all of whom are members of the Quapaw Nation, first filed suit in this Court on January 5, 2011, in a case captioned <u>Grace M. Goodeagle v. United States</u>, No. 1:11-cv-00009. The Government successfully argued that Claimants' suit was barred by 28 U.S.C. § 1500 during the pendency of <u>Cobell v. Salazar</u>, No. 96-CV-1285 (D.D.C.), a class action lawsuit brought against the United States for mismanagement of Indian trust funds. Claimants' suit was dismissed on August 25, 2011.

13. After completion of the <u>Cobell</u> case, the individual Quapaws restated and re-filed their complaint in this Court on June 28, 2012, in a case captioned <u>Grace M. Goodeagle v.</u>

United States, No. 1:12-cv-00431.  The United States moved to dismiss many of the claims of the individual Claimants and the tribe, arguing that the claims were barred by the statute of limitations or were claims for which the United States had not waived sovereign immunity.  In an opinion reported at Goodeagle v. United States, 111 Fed. Cl. 716 (2013), the Court granted the Government's motion to dismiss some claims. The Court held that the Quapaw's claims for damages for mismanagement of agricultural and town lot leases were timely in respect to actual leases, but were time barred for allegations seeking damages for lots that could have been leased but were not.  The Court further held that the claim seeking damages for the Government's alleged failure to properly manage the land's natural resources or properly supervise mining that took place on the land was also untimely.  Finally, the Court held that the Quapaw's claims for mismanagement of trust assets did not fall under the tolling provisions of the Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786, 1002, because those provisions only extend the statute of limitations for claims of mismanagement of trust funds, not trust assets.

14. The Quapaw Tribe filed suit on its own behalf on September 11, 2012, in a case captioned Quapaw Tribe of Oklahoma (O-Gah-Pah) v. United States, No. 1:12-cv-00592.  The Tribe asserted breach-of-trust legal claims against the United States under the Tucker Act, 28 U.S.C. § 1491 and the Indian Tucker Act, 28 U.S.C. § 1505.  As in Goodeagle, the Government moved to dismiss many of the Tribe's claims on statute of limitations grounds.  In an opinion reported at Quapaw Tribe of Oklahoma v. United States, 111 Fed. Cl. 725 (2013), the Court dismissed several of the Tribe's claims.  The Court held that the Tribe's claim that the Government breached its fiduciary duty by transferring the tribal lands known as the Catholic Forty to Catholic Church was untimely because the initial transfer, which triggered the statute of limitations, occurred in 1908.  The Court also held that the statute limitations barred the Tribe from seeking damages for the environmental contamination of its land caused by the Government's alleged mismanagement of the Tribe's natural resources.

15. On May 30, 2012, Congressman Tom Cole of Oklahoma submitted to the United States House of Representatives H.R. 5862, entitled "A Bill Relating to members of the Quapaw Tribe of Oklahoma (O-Gah-Pah)."  The bill provided that:

> Pursuant to the findings and conclusions contained in the Report issued by the chief judge of the U.S. Court of Federal Claims, the Secretary of the Treasury shall pay, out of money not otherwise appropriated, to members of the Quapaw Tribe of Oklahoma (O-Gah-Pah), the sum of $ _____, and to the Quapaw Tribe of Oklahoma (O-Gah-Pah), the sum of $ _____.
> _____

6

16. On December 19, 2012, the United States House of Representatives passed House Resolution 668, referring to the Chief Judge of this Court a bill, H.R. 5862, entitled "A Bill relating to members of the Quapaw Tribe of Oklahoma (O–Gah–Pah)." H.R. Res. 668, 112th Cong. § 1 (2012). Section 1 of the Resolution states:

> Pursuant to section 1492 of title 28, United States Code, the bill (H.R. 5862), entitled "A Bill relating to members of the Quapaw Tribe of Oklahoma (O–Gah–Pah)," now pending in the House of Representatives, is referred to the chief judge of the United States Court of Federal Claims for a determination as to whether the Tribe and its members have Indian trust-related legal or equitable claims against the United States other than the legal claims that are pending in the Court of Federal Claims on the date of enactment of this resolution.

17. Section 2 of the Resolution contains the proceeding and report instructions to the Court upon receipt of the bill:

> Upon receipt of the bill, the chief judge shall—
>
> (1) proceed according to the provisions of sections 1492 and 2509 of title 28, United States Code, notwithstanding the bar of any statute of limitations; and
>
> (2) report back to the House of Representatives, at the earliest practicable date, providing—
>
> > 1. findings of fact and conclusions of law that are sufficient to inform the Congress of the nature, extent, and character of the Indian trust-related claims of the Quapaw Tribe of Oklahoma and its tribal members for compensation as legal or equitable claims against the United States other than the legal claims that are pending in the Court of Federal Claims on the date of enactment of this resolution; and
> >
> > 2. the amount, if any, legally or equitably due from the United States to the claimants.

18. Several Congressional Representatives made floor statements in support of the reference, including Representative Lamar Smith of Texas, Chair of the House Judiciary Committee, and Representatives Tom Cole of Oklahoma and Zoe Lofgren of California. A complete copy of the Congressional Record from the day the

7

Representatives made their statements in support, 158 Cong. Rec. H7,281 (daily ed. Dec. 19, 2012), is attached as an exhibit to this Report.

19. On January 22, 2013, the Clerk of the House of Representatives transmitted House Resolution 668 to the Chief Judge of the U.S. Court of Federal Claims. On January 24, 2013, the Chief Judge issued an order designating the Honorable Thomas C. Wheeler as the Hearing Officer in the case, which was captioned Thomas Charles Bear v. United States, No. 1:13-cv-00051. In addition, the Chief Judge Appointed a Review Panel consisting of the Honorable Francis M. Allegra as Presiding Officer, and the Honorable Lynn J. Bush and the Honorable Nancy B. Firestone as members. Due to changes in the composition of the Court, the Review Panel now consists of the Honorable Charles F. Lettow, the Honorable Patricia E. Campbell-Smith, and the Honorable Nancy B. Firestone; Judge Lettow is the Presiding Officer.

20. On January 22, 2013, the Clerk of the Court notified Claimants, as required by RCFC Appendix D, Paragraph 2, that they had 90 days to file suit. Claimants filed their complaint in this case on March 25, 2013. The United States moved to dismiss the case, and the Court denied the motion to dismiss on September 17, 2013, in an opinion reported at Bear v. United States, 112 Fed. Cl. 480 (2013). Claimants amended their complaint on February 14, 2014, to add an additional 3,580 individuals, each of whom was believed at that time to be an enrolled adult member of the Quapaw Tribe of Oklahoma and a lineal descendant of one or more persons identified on the original list of enrolled Quapaw Tribal members certified by the Secretary of the Interior on February 8, 1890, and subsequently re-certified by the Secretary as the judgment roll listing all members of the Tribe as of April 1961.

21. For purposes of discovery and administration, the proceedings in this congressional reference case were procedurally coordinated with those in the related Goodeagle and Quapaw cases. The coordination of the three cases was aided by the fact that the Hearing Officer for this case was also the presiding judge in Goodeagle and Quapaw.[1] From December 16, 2013 to July 14, 2016, the parties engaged in an extensive discovery process during which they produced 856,474 documents. Additionally, the parties took 42 depositions, and produced 25 expert reports and 26 rebuttal expert reports.

22. During the coordinated Bear, Goodeagle, and Quapaw litigation, the Hearing Officer determined, in an opinion reported at Quapaw Tribe of Oklahoma v. United States, 123

---

[1] For the purposes of this Report, the Hearing Officer will describe himself as "the Hearing Officer" even when describing an action he took as the presiding judge in Goodeagle and Quapaw.

Fed. Cl. 673 (2015), that the Quapaw Analysis was binding on the Government with respect to some of the Quapaw Tribe's legal claims. Accordingly, the Hearing Officer granted summary judgment to the Quapaw Tribe on claims for unpaid educational treaty payments, unauthorized disbursements from Tribal trust accounts, and unauthorized transactions in Tribal trust accounts. The Hearing Officer also ruled, in an opinion reported at Quapaw Tribe of Okla. v. United States, 120 Fed. Cl. 612 (2015), that the Quapaw Tribe was the proper recipient of any undistributed judgment funds from a prior Indian Claims Commission judgment. These particular claims, which according to Claimants, were not barred by the applicable statute of limitations, are part of a separate settlement agreement between the Parties in the Goodeagle and Quapaw cases. Copies of the settlement agreements in those cases are attached as an exhibit to this Report.

23. The Hearing Officer also resolved a set of discovery disputes, ordering the United States to produce 822,473 documents in an organized and labeled fashion, and to produce a knowledgeable person or persons to respond to Claimants' RCFC 30(b)(6) notice of deposition.

24. The Hearing Officer also held, in an opinion reported at Goodeagle v. United States, 122 Fed. Cl. 292 (2015), that Plaintiffs in the Goodeagle and Quapaw cases were entitled to recover either statutory interest (the Tribe only) or the amount the funds would have earned, had the funds been deposited in the Claimants' accounts and invested in accordance with Bureau of Indian Affairs ("BIA") policy. In that opinion, the Court wrote:

> The Government began investing Plaintiffs' IIM funds in 1966. Along with the choice to invest came the duty to invest prudently in order to maximize return on the accounts.
>
> . . . .
>
> Once the Government took Plaintiffs' IIM funds into trust and began investing them in group securities, the Government had an obligation to Plaintiffs to make them as productive as possible through prudent investment, maximizing return on the funds. Failure to do so constitutes a breach of fiduciary duty and gives rise to Plaintiffs' claim for lost profits for the time period in which the Government did not prudently invest the IIM funds.

Had this congressional reference case gone to trial, Claimants (including the Quapaw Tribe) would have asserted that the foregoing methodological approach would apply to

their equitable claims in this case, while the Government would have opposed Claimants' assertion and argued for the application of the Government's own methodological approach.

25. In June 2016, Claimants filed a motion for partial summary judgment on the remaining Quapaw Analysis-based claims concerning agricultural leasing losses, town lot losses, and the Pioneer Chat pile losses and argued that the Quapaw Analysis was binding on these claims. The Quapaw Tribe's argument relied, in part, on the settlement of the Tribe's accounting case pursuant to which the Quapaw Analysis was created. The settlement agreement stated that the Quapaw Analysis would be deemed to be an accounting of the United States' management of the Tribe's assets.

26. In response, the United States asserted that the Quapaw Analysis was not binding because the Quapaw Analysis Contract stated that the United States "does not, in any way, acquiesce in or limit its potential defenses to any conclusions reached by the . . . Quapaw Analysis. Nor shall the Quapaw Analysis be deemed to be an accounting of the Tribe's Tribal Trust Fund accounts prepared or endorsed by Interior." The Government asserted that it accepted the Quapaw Analysis as "an acceptable final deliverable" because "the Quapaw Analysis deliverable appear[ed] to meet the definition of the Quapaw Analysis as stated in . . . OHTA's contract with QIS." The Government stated that "OHTA's determination of the Quapaw Analysis as an acceptable final deliverable does not mean that OHTA or the Interior Department agrees with or endorses the substantive issues, statements, allegations, quantifications, or claims within the Quapaw Analysis."

27. On September 12, 2016, the Hearing Officer determined, in an opinion reported at Goodeagle v. United States, 128 Fed. Cl. 642 (2016), that the Quapaw analysis is binding on the Government as to its factual findings, but not as to the valuation, extrapolation, and calculation models employed in the Quapaw Analysis to calculate damages, and not as to the results of the models. In the opinion, the Hearing Officer noted that "[t]he Government convincingly argue[d] that if it cannot challenge the models used, then the 'United States handed a blank check to the QIS team [and] . . . delegated to the Tribe the absolute right to unilaterally dictate the amount of money the United States owes to the Tribe.'"

28. The United States believes that the Hearing Officer's ruling that the Quapaw Analysis is factually binding is both legally and factually erroneous, and notes that, absent the proposed compromise and settlement on the terms stated in this Report, the Government would have the right to seek review of this decision from the Review Panel. Similarly, Claimants believe that the Hearing Officer erred in ruling the Quapaw Analysis's valuation, extrapolation, and calculation models non-binding and that, absent the

proposed compromise and settlement on the terms stated in this Report, they would have the right to seek review of the decision from the Review Panel. The Parties nonetheless have agreed to forego the Review Panel's review in the interest of this proposed compromise and settlement.

29. Trial in this case was consolidated with trial in <u>Goodeagle</u> and <u>Quapaw</u>. It began on September 20, 2016, in Miami, Oklahoma. The Hearing Officer conducted a site visit of restricted and unrestricted Tribal and allotted lands and then, on September 21 and 22, heard the testimony of ten elder members of the Quapaw Tribe.

30. The Parties were set to litigate the remainder of the case in a six-week trial to commence on October 11, 2016, in Washington, D.C. However, on October 11, 2016, the Parties informed the Hearing Officer that they were near settlement. On October 13, 2016, the Parties informed the Hearing Officer that they had reached a proposed settlement this congressional reference case, as well as <u>Goodeagle</u> and <u>Quapaw</u> and, as part of that proposed settlement, agreed to submit this Joint Agreement, Stipulation, and Recommendation to the Hearing Officer requesting issuance of a report by the Chief Judge to the House of Representatives.

31. The Parties then devoted extensive time to finalizing the terms of the settlement agreement; identifying and attempting to locate Claimants whose whereabouts were unknown, who were deceased, or who had no interests in this cause of action; drafting informational notices and disclosures for the settlement outreach process; discussing the formula for distributing the settlement proceeds between the Quapaw Tribe and the individuals; and transmitting the notices and disclosures of the settlement terms and obtaining acceptances from individual claimants in <u>Goodeagle</u>. During this period, the Parties spent one year in a mediation process with the Honorable Eric Bruggink of the Court of Federal Claims's alternative dispute resolution program.

32. When it appeared that settlement efforts ceased making progress, the Hearing Officer set a trial date of September 30, 2019 for <u>Bear</u>, <u>Goodeagle</u>, and <u>Quapaw</u>. The Parties then began to update expert reports, depose new witnesses, and submit witness lists, exhibit lists, and pre-trial memoranda to the Court. The Parties continued the settlement negotiations, however, and, on September 28, 2019, filed a Joint Motion to Stay the trial because they had reached an agreement in principle to settle the litigation. The agreement in principle again provided that the Parties would submit this Joint Agreement, Stipulation, and Recommendation to the Hearing Officer and request issuance of a report by the Chief Judge to the House of Representatives.

II. The Claims

33. Claimants allege equitable claims and damages in seven categories:

| Claimants' Damages Claim | Claimants' Assertions |
|---|---|
| Improper conveyance of the Catholic Forty lands | $597,942 |
| Mismanagement of Quapaw agricultural land | $86832078 |
| Destruction of natural resources on the Quapaw lands | $243,329,000 |
| Mismanagement of Quapaw town lot leases | $235,120,028 |
| Mismanagement of Quapaw mining leases | $4,609,419,382 |
| Mismanagement of Quapaw chat leases | $614,257,250 |
| Failure to collect royalties from the Ottawa chat pile | $18,955,256 |
| Failure to manage Sooner chat pile interests | $1,738,702.93 |
| Total | $5,810,249,638.93 |

34. The Quapaw Tribe claims that the United States conveyed forty acres of the Tribe's land to the Catholic Church without compensating the Tribe. Claimants cite the Quapaw Analysis's statement that in 1908, without the Quapaw's knowledge, the Government deeded forty acres of the Tribe's trust land (the Catholic Forty) to the Catholic Church, which in 1927 closed the Indian school it had been operating and instead commenced mining operations on the land.

35. The Quapaw Tribe argues that the only possible legitimate claim the Catholic Church had to the land was to use the land for educational purposes, but that the Catholic Church abandoned use of the land for that purpose in 1927, and that the land should then have reverted to the Tribe. The evidence shows that all the royalties from the mining and chat sales on the Catholic Forty went to the Church, and not the Tribe. Claimants assert that the Government's uncompensated conveyance of the Catholic Forty was a wrongful act causing damage to the Tribe—an equitable claim within the terms of the Congressional Reference.

36. The United States contends that in 1908 Congress passed a law, Act of May 29, 1908, ch. 216, Pub. L. No. 60-156, § 6 (35 Stat. 444, 446), that authorized the Secretary of the Interior to issue a patent to the Bureau of Catholic Indian Missions for the Catholic Forty parcel. The Government notes that Congress observed in the Act that the Catholic Forty had "been set apart to the Roman Catholic Church for church and school purposes by the Quapaw national council, on August twenty-fourth, eighteen hundred and ninety-three, and said church having maintained a church and school thereon since that date." The Government argues that, since the Catholic Forty parcel was transferred to the Catholic Church pursuant to Congressional authorization as a fee simple transfer conveying full ownership rights, there is no basis for Claimants to argue that the land

should have reverted to them or that they are entitled to revenues from that land.  In addition, the Government contends that there can be no breach of trust if Congress authorized the land transfer.  The Government refers to the United States Supreme Court's opinions in United States v. Jicarilla Apache Nation, 564 U.S. 162 (2011) and Winton v. Amos, 255 U.S. 373 (1921) to support this proposition.

37. The Quapaw Tribe owns approximately 568.02 acres of land, known as the Tribal Industrial Park, which the United States holds in trust for the Tribe.  Claimants allege that the United States charged less than fair market value for agricultural leases on the Quapaw Tribe's Industrial Park land.   The Quapaw Analysis team inspected two agricultural lease life-cycles and asserted numerous Government failures-to-collect under these leases, including: there being no documents related to the fair annual rental valuations, non-compliance with the lease not being enforced, failure to require bonds, failure to collect rents due, and failure to charge interest on delinquent rents.  The Government disputes these allegations, in particular, the findings and conclusions upon which Claimants rely in the Quapaw Analysis.

38. The Quapaw Tribe and individual members claim that the United States mismanaged Quapaw agricultural land by allowing the deposit of mining wastes on the land and failing to charge fair market rents for agricultural land.  Claimants allege, based on the Quapaw Analysis, that much of the Quapaw's valuable agricultural land is now covered by chat.  Photographs of Quapaw land covered by chat are attached as an exhibit to this Report.  Claimants aver that the Quapaw Analysis team carefully identified agricultural lands that, because they were covered with mining waste, would not grow crops and created an economic model to measure income lost as a result.  Claimants further allege that, using available documents, the Quapaw Analysis investigated and made individualized findings as to each of the thirteen allotments, demonstrating that BIA had failed in its trust obligations by covering portions of the agricultural land with chat and mining waste, entering into sub-market leases, failing to collect rent when due, and failing to attempt to lease or make productive use of the land, resulting in significant losses to the Quapaw owners.  The Government disputes these allegations and disputes the merits of the damage methodologies employed by the Quapaw Analysis in reaching these conclusions.

39. The Quapaw Tribe and individual members claim that contamination and subsidence from Government-authorized and Government-regulated mining destroyed the natural resources on approximately forty square miles of Quapaw allotted land.  Claimants argue that the Government's mismanagement of lead and zinc mining on Quapaw lands has destroyed their economic (as well as cultural) value to the Quapaw and that the Government's mismanagement of mining operations turned much of the prime farm land into a desolate wasteland, now laden with heavy metals.  Claimants further contend

that subsidence due to the Government's failure to require appropriate structural safeguards when mining took place poses a serious hazard and danger to life on the Quapaw Reservation.

40. The U.S. Environmental Protection Agency ("EPA") designated approximately 40 square miles of Quapaw allotted land as the Tar Creek Superfund site in 1983, and EPA began work on the site in 1984. Claimants believe that, even when this cleanup is completed, most of the land and water will remain contaminated and unusable. Claimants assert equitable claims based on the loss in land value and the loss in natural resource value resulting directly from the Government's alleged wrongful or negligent management of mine leases it granted on Quapaw lands.

41. The United States disputes these allegations and contends that, when the clean-up is completed, Quapaw lands will no longer be contaminated and will be usable for their intended uses, such as agricultural uses. Furthermore, the Government notes that, for fiscal year 2016, the Tar Creek Superfund site received the third highest funding of superfund sites in the country and that Tar Creek regularly ranks within the top ten superfund sites in terms of funding. Moreover, the Government argues that the EPA helped the Quapaw Tribe to become a contractor for the Tar Creek Superfund clean-up and, as of October 6, 2016, the EPA had funded the Quapaw Tribe Environmental Office with a total of $20,039,799 to remediate various locations at the site. Finally, the Government emphasizes that the EPA has plugged over 66 old, poorly-constructed wells; remediated over 2,940 residential yards; funded the voluntary relocation of approximately 600 homes; and remediated millions of tons of chat. The Government also avers that the EPA is remediating chat across Quapaw lands and the remediation plan calls for all chat to be sold or removed to permanent repositories. The EPA is also in the process of developing a new operable unit at the Tar Creek site to address surface water contamination at the site. Claimants contend that these prior actions have been largely unsuccessful and that future plans fail to address many of the more devastating environmental problems that continue to affect the land and the Quapaw people.

42. Individual members of the Quapaw Tribe claim that the United States mismanaged Quapaw town lots by allowing the deposit of mining wastes on those lots and failing to charge fair market value for town lot leases. Claimants allege, based on the Quapaw Analysis, that mining operations under Government-granted leases rendered half of the Quapaw's 14,500 town lots unusable by 1926 due to chat pilings that covered the lots. Claimants contend that the number of leasable lots decreased over time as the BIA allowed more chat to be piled up on the lots. Claimants allege, based on the Quapaw Analysis, that these losses resulted from the Government's failure to hold the lessees responsible for their disposal of mining waste on these town lots.

14

43. The United States contends that the mining leases specifically allowed mining companies to use the surface to, among other things, dispose of waste. For example, the Government cites one 1960 lease stating that the mining-company lessee "shall have the right to occupy and use so much of the surface of said leased premises as in its judgment shall be necessary to properly conduct prospecting, mining, production and removal of ores, minerals, and substances hereunder, including . . . the right to stack waste rock and soil." Claimants assert that the Government had complete control over the mining leases and that any rights granted to the mining companies that resulted in detrimental effects to the land constitute a breach of trust.

44. Claimants allege, based on the explicit findings of the Quapaw Analysis, that the records—or lack thereof—reveal a pattern of neglect in the management of this trust property for the benefit of its Indian owners that the Government has allowed to continue since 1918. Claimants retained former BIA officials Karole Overberg, John Dalgarn, and Stephen Elsberry as expert witnesses. They prepared expert reports and rebuttal expert reports. Overberg, a former BIA superintendent with 29 years of experience working on Indian realty issues, reviewed historical Government correspondence and stated in his expert report that "collections for the Quapaw town lots leases never exceeded 50%," due "in large part [to] the fact that the Government never allocated the necessary resources to manage the situation." Dalgarn, the former Realty Specialist for the BIA's Miami Agency, similarly reviewed historical Government correspondence and opined in his expert report that "[t]he Agency never collected but a fraction of the rental fees it should have from people living on or occupying town lots" and "[a]mounts they were able to collect were well below fair market value." The United States disputes these allegations.

45. Claimants' expert witnesses further opined that, based on the Quapaw Analysis, the Government failed to charge adequate rents for these town lots, and reduced rental values by half in 1931 and 1932. Claimants allege, based on the Quapaw Analysis, that the fair annual rental for developed town lots was $150.00, as shown in a 1978 appraisal by Elsberry, a former BIA appraiser assigned to appraise the Quapaw town lots, which valued the developed town lots at $3 per front foot. Elsberry opined in his rebuttal report for Claimants that the rentals charged by the BIA of "$1 per front foot undervalued the developed lots on Quapaw Indian lands." Elsberry further opined in his expert report that the undervaluation was caused, individually and collectively, by the Government's failure to conduct regular appraisals on the town lots, failure to appraise lands at the highest and best use, failure to account for improvements on the surface that should have been owned by the Indian landowners, failure to control subleasing, failure to secure and collect rental payments, and failure to require lessees to comply with lease terms.

46. The United States contests Claimants' allegations and the opinions expressed by Claimants' expert witnesses.  The Government contends that Elsberry ignored contrary appraisal data, including appraisals from 1962, 1971, 1978, and 1979.  The Government also contends that both Overberg and Dalgam based their assessment of historical rent collections on an unduly small sample of documents and that they did not conduct any independent research.  Additionally, the Government contends that Dalgam stated in his deposition that rent collections were "up to 75 percent usually" during his tenure as Realty Specialist.

47. The individual members of the Quapaw Tribe claim that the United States issued mining leases for lead and zinc on Quapaw lands for below-market royalties and failed to obtain any royalties at all for germanium and sulfuric acid mined from Quapaw land.  Claimants' expert witnesses, Dr. Christopher Breeds and Edward Keheley, opined that the Government mining leases provided royalty rates that were well below market and that the Government failed to properly enforce the Quapaw mining leases that were in place.  Claimants assert, based on opinion and calculations from Dr. Breeds, that the Quapaw should have received substantial royalties for two other minerals, germanium and sulfur, for which the Government failed to collect any royalties at all.  Claimants allege that BIA's leasing practices encouraged mining companies to mine only the most profitable ore, leaving less profitable but still valuable ore in the ground (a practice known as "high-grading").  Claimants allege that Dr. Breeds and Keheley both reported that high-grading occurred on restricted Quapaw land throughout the mining period, resulting in the loss of royalties associated with sterilized lower-grade but still profitable ore.  Keheley also calculated and offered his opinion that the restricted Quapaw allottees lost substantial royalties due to this high-grading practice.

48. The United States disputes the merits of Claimants' allegations and expert witness opinions.  The Government's expert witness, Alan K. Stagg, asserted that Dr. Breeds used flawed assumptions and methodology in his calculations, making his values of unpaid royalties unreliable.  Also, the Government's expert witness Greg Chavarria challenged Mr. Keheley's accounting methods, noting that Keheley's calculation presumed a hypothetical 20 percent royalty and did not cite to specific leases or ledgers.  The Government's expert witness David L. Leach opined that the composition of the mining fields made mining for lower grade ore difficult and uneconomical, especially using earlier manual techniques.

49. Individual members of the Quapaw Tribe claim that the United States leased and sold mining tailings, commonly known as "chat," produced from mining on Quapaw land at below-market prices.  Claimants' expert Dr. Lynn, an engineer and co-owner of a construction materials testing and engineering firm with experience using chat, opined that for the sales of Quapaw chat from 1924 to 1996, the federal Government failed to

obtain fair market value for the Quapaw allottees' chat, resulting in substantial lost royalties.

50. The United States disputes the merits of Claimants' allegations and expert witness opinions.  The Government's expert witness, John Lizak, challenged Dr. Lynn's methodology of creating a model chat price that did not rely on reported available prices.  Mr. Lizak stated that Dr. Lynn's model sales data greatly overstated chat sales when compared with actual sales data and that Dr. Lynn relied on a single hypothetical royalty rate for a 92-year time frame, which was higher than market royalty rates.  Further, Mr. Lizak stated that Dr. Lynn's trespass claims and underpayment analysis were based on incorrect data.  Government expert witnesses Cliff Sunda and Richard M. Voelker challenged Mr. Keheley's assumptions and calculations of the amount of chat used for applications such as roads and railroads.

51. Florence Whitecrow Mathews, Ardina Revard Moore, and Jean Ann Ramsey, who claim to own restricted interests in the Ottawa chat pile, testified during the Miami phase of the trial in 2016 that Bingham Sand & Gravel Company, a non-Indian contractor, removed restricted chat from the Ottawa Chat Pile without a BIA-approved contract and without compensation to the restricted owners.  Claimants contend that the Government was obligated to approve contracts for the removal of the chat and to collect compensation, or to take action against Bingham as a trespasser, and that the Government failed to take either action, resulting in losses to the restricted owners.  The United States disputes these allegations.  The Government intended to show at trial that the Bingham Sand & Gravel Company owns over 76 percent of the Ottawa chat pile.

52. Some individual members of the Quapaw Tribe claim that the Government mismanaged their restricted interests in the Sooner chat pile by failing to maintain control over restricted chat when the associated land was sold to a non-Indian.  Tamara Ann Romick Parker and Phyllis Romick Kerrick testified at the Miami phase of the trial and alleged that they were deprived of a current ownership interest in the Sooner Chat Pile due to the Government's mismanagement of their predecessors' restricted chat interests.  The Government disputes these allegations.  The Government asserts that Claimants' ancestors applied to have the restrictions on their property removed and that the removal applied to their chat interests as well.

53. Claimants retained expert witnesses Peter Ferriera and Kevin Nunes of Rocky Hill Advisors, Inc. to determine the amount of investment income that they would have earned had the alleged losses been timely collected.  In their expert witness report, Ferriera and Nunes offer opinions as to total amount of damages for each claim, including investment income, which are reflected in the valuation chart included above in finding 33 for each of Claimants' equitable claims.  The Government disputes that

the investment model used in the Rocky Hills report is correct, proper, and appropriate for calculating damages.

54. The United States disputes the factual bases for Claimants' claims and the Claimants dispute the factual bases for the defensive positions of the United States. The United States presented during discovery, and planned to present at trial, evidence showing that Claimants' allegations regarding breach were and are factually incorrect. Defendant's witnesses regarding breach included: Sam Beets, Realty Specialist at the BIA Miami Agency Office; Dr. Jay L. Brigham, expert historian; Michael Estes, current Supervisory Program Analyst for the Land Buy-Back Program for Tribal Nations and former Program Analyst for the OHTA; James Ferguson, Deputy Program Manager for Land Buy-Back Program at Department of the Interior; John Meyer, EPA Region 6 Branch Chief of Superfund Remedial Branch; and Paul Yates, Superintendent of the BIA Miami Agency Office.

55. Furthermore, the United States disputes Claimants' damages calculations and the Claimants dispute the positions and calculations of the United States relating to damages. The United States presented during discovery, and planned to present at trial, evidence showing that, even if Claimants had shown that breaches occurred, Claimants' damage calculations were, among other things, inflated, contrary to market realities, and counterfactual. In addition, the Government intended to present evidence that Plaintiffs' claims are premised on inconsistent and overlapping theories of recovery that would result in double counting of claimed damages for given ownership interests. Defendant's expert witnesses regarding damage calculations included Dr. Jay L. Brigham, historian; Greg Chavarria, accountant; Larry Dixon, Certified Professional Landman; Michael Donlan, natural resource damages expert; Dr. William G. Hamm, economist; Dr. Darren Hudson, agricultural economist; Dr. David L. Leach, geologist; John Lizak, mineral valuation expert; Dr. Shirlene Pearson, statistician; Dr. Timothy Riddiough, real estate economist; Alan Stagg, economic geologist; Cliff Sunda, GIS mapping and photogrammetric specialist; Richard Voelker, Professional Engineer; and Beverly Weissenborn, MAI Real Estate Appraiser.

56. Although the United States does not necessarily agree that the Quapaw Tribe and its members are entitled to recover damages for each of these claims, the United States does believe that, in order to avoid protracted litigation, it would be fair, just, and equitable for the Hearing Officer to recommend to the House of Representatives to pay Claimants a total sum of $137,500,000.00 for the extinguishment of any and all claims Claimants have asserted or could have asserted, directly or indirectly, under the terms of H.R. 5862.

57. Notwithstanding their different positions regarding breach of trust, liability, and damages, the Parties agree that these claims are appropriate for inclusion in an overall compromise and settlement of all the congressional reference claims, as well as all legal claims that were or could have been asserted in <u>Goodeagle</u> or <u>Quapaw</u>.  For these reasons the Parties jointly agree, stipulate, and recommend that the Chief Judge of this Court should report to the House of Representatives on the claims presented in the Congressional Reference with the proposed compromise and settlement as set forth in the Disposition Section below.

58. The Claimants' claims in <u>Goodeagle</u> and <u>Quapaw</u> were dispensed with in a similar manner.  As in this congressional reference case, the Government did not concede liability in those cases, either.  However, the Government did agree to settle Claimants' claims in those cases for a total of $82,965,000.00.  Copies of the Parties' settlement agreements are included as attachments to this Report.

Conclusions of Law

The Hearing Officer reports the following conclusions of law:

1. 28 U.S.C. §§ 1492 and 2509 define the Court's jurisdiction in congressional reference cases.  They require the Hearing Officer to make findings of fact and conclusions of law sufficient to inform Congress whether the Claimants' demands constitute legal claims, equitable claims, or gratuities.  As this Court noted in <u>Bear Claw Tribe, Inc. v. United States</u>, 36 Fed. Cl. 181 (1996), <u>aff'd</u>, 37 Fed. Cl. 633 (1997), an equitable claim is one that does not have an enforceable legal remedy:

> The term "equitable claim" . . . has a particular meaning when used in congressional reference cases.  In general, an equitable claim involves an injury, caused by the Government, for which there is no enforceable legal remedy—due, for example, to the sovereign immunity bar or the running of the statute of limitations period.

2. As the Hearing Officer in this case observed in an opinion reported at <u>Bear v. United States</u>, 112 Fed. Cl. 480, 485 (2013), "for a legal claim to exist, there must be a viable legal remedy, and where a claim is barred on statute of limitations or sovereign immunity grounds, it is not a legal claim.  In such circumstances, however, relief may still be possible on equitable grounds."  To establish and equitable claim, a claimant must demonstrate that "the Government committed a negligent or wrongful act" and that the "act caused damage to the claimant."  <u>Id.</u>

3. In <u>United States v. Mitchell</u>, 463 U.S. 206, 225 (1983), the Supreme Court held that:

19

> [W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

4. To state a legally cognizable claim, "a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." United States v. Navajo Nation, 537 U.S. 488, 506 (2003) ("Navajo I"). "If that threshold is passed, the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" Id. (quoting Mitchell, 463 U.S. at 219). This analysis "must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." Id.

5. Claimants argue that their claims stem from the BIA's legal obligations arising under statutes and other provisions of federal law that Claimants contend are rights-creating, and that the BIA's failure to satisfy its legal obligations warrants money damages. Conversely, the United States asserts that the Claimants' claims do not stem from specific, rights-creating legal obligations and that money damages are, therefore, unwarranted. Despite their different positions, the Parties nevertheless agree that these claims are appropriate for inclusion in an overall proposed compromise and settlement of all congressional reference claims.

6. Under general trust law, "a beneficiary is entitled to recover damages for the improper management of the trust's investment assets." Confederated Tribes of Warm Springs Reservation of Or. v. United States, 248 F.3d 1365, 1371 (Fed. Cir. 2001). Courts determine the amount of damages for such a breach by attempting to put the beneficiary in the position in which it would have been absent the breach. Id. "It is a principle of long standing in trust law that once the beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee." Id.

7. Investment income is a component of tribal damages in Indian trust cases. In Confederated Tribes of Warm Springs, the Federal Circuit stated that courts "should presume that the funds [owed the trust] would have been used in the most profitable [manner]" and the "burden of providing [sic] that the funds would have earned less than that amount is on the fiduciaries . . . ." Id. (quoting Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985)). In Jicarilla Apache Nation v. United States, 112 Fed. Cl.

274, 309 (2013), this Court accepted an investment model proffered by the tribal plaintiff in that case to determine the investment value of damages because the tribal plaintiff's model "represented a reasonable proxy for how the trust funds in question should have been invested" and provided "a reasonable and appropriate basis for calculating the damages owed."

8.   Claimants in this case allege that the same model should apply to their claims to bring their damages to present value and as a measure of overall damages. They argue that, had the Government properly restricted land and assets and timely collected compensation, the Government would have been obligated to invest the funds as set forth in Jicarilla Apache Nation, and that the Jicarilla Apache Nation model is the proper methodology for determining the present value and overall losses associated with Claimants' equitable claims. In ruling on three of the Quapaw Tribe's claims in 2015, in Quapaw Tribe of Oklahoma v United States, 123 Fed. Cl. 673, 678 (2015), the Hearing Officer ruled that the Quapaw Tribe was entitled to "investment income that would have been earned if these amounts had been timely credited to the Quapaw Tribe's account."

9.   The United States disputes that Claimants are entitled to damages, contending that Claimants' claims do not stem from specific, money-mandating legal obligations and that further, Claimants' investment model is not the correct, proper, and appropriate methodology for determining damages. The Government also contends that, to the extent that any damages are appropriate, the correct, proper, and appropriate approach for addressing any such damages is the one set forth by the Government's expert witness, Dr. William G. Hamm. Additionally, the Untied States asserts that the decision in Jicarilla Apache Nation was wrongly decided and that the damages model upheld in that case is otherwise inapplicable to Claimants' claims in this congressional reference case.

<u>Disposition</u>

The Hearing Officer agrees with the Parties that there has been sufficient factual and legal development of all claims to support a compromise and settlement of this case. Given the extensive development of the legal and factual record that has already occurred in this and prior litigation between the Parties and given the Parties' careful consideration and negotiation of the legal and factual issues in this congressional reference case, the Hearing Officer agrees with the Parties that their proposed compromise and settlement set forth in their Joint Agreement, Stipulation, and Recommendation and embodied in this Report is proper and fully informed. The contested facts and assertions of law are contained in the hundreds of pages of briefing, the 51 expert reports, the 4,386 trial exhibits, and the testimony of over 48 witnesses.

The Hearing Officer understands that, in agreeing to recommend the settlement of the congressional reference case on the terms contained in this Report, the Parties took into consideration all of the foregoing and conflicting evidence, all claims and defenses which were or might have been asserted by the Parties in this case, including the costs of this and future litigation or administrative proceedings, and the Parties' desire and intention to resolve these claims with finality.

The Hearing Officer therefore recommends the following disposition of this case:

1.  It would be fair, just, and equitable to pay Claimants a total sum of $137,500,000 for the extinguishment of all claims that Claimants have asserted or could have asserted under the terms of H.R. 5862.

2.  The parties should bear their own attorneys' fees, costs, interest, and other expenses.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge